UNITED STATES of America,

v.

Charles E. WADE, et al., Defendants.

No. Crim. 96–0472 (RCL).

United States District Court,
District of Columbia.

Dec. 10, 1997.

8

Barry Wiegand, Asst. U.S. Atty., Washington, DC, for U.S.

Andrew McGuire, Washington, DC, for petitioners.

Mitchell Seltzer, Washington, DC, for James Wade.

Joanne Vasco, Washington, DC, for Eugene Wade.

Thomas Abbenante, Washington, DC, for Charles E. Wade.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the motions of defendants Charles Wade and James Wade and third-party interveners Shelton Wade, Sheila Gant, Angel Wade, Jean Wade and Dorothy Wade to stay, va-

cate and reconsider this court's September 25, 1997 Order of Abatement for the property located at 647 G Street, S.E.; the government's opposition; and the oral arguments of all parties. For the reasons stated below, the motions are hereby denied.

### I. BACKGROUND

Since at least early 1994, the Washington Metropolitan Police Department had been receiving reports that individuals were selling drugs in front of a brick row-house located at 647 G Street, S.E., Washington D.C. From April 1995 through January 1997, the police received some 42 complaints about the alleged drug trafficking activity. As an expression of their concern, a local neighborhood citizen's association took their complaints about these recurring drug transactions to a D.C. Councilman and to the United States Attorney for the District of Columbia.

In October 1994, the police began an undercover investigation of the alleged narcotics trafficking inside and in front of 647 G Street, S.E. According to police reports written in conjunction with their investigation, the distribution of the drugs usually took place in front of the house, with the distributor coming out of the house with a small quantity of drugs to sell either to pedestrians or to individuals who were driving by the house. Upon making the sale, the distributor would take the money into the house and would retrieve additional drugs for sale. Over the course of their two-year investigation, the police purchased drugs from seven different individuals in front of 647 G Street, S.E. on ten separate occasions. These individuals were Love Wade, Charles Wade, Wesley Baker, Raymond Parks, Leon Creek, Rodney Banks and Floyd Davis.

In addition to these undercover drug buys, the police confiscated drugs from 647 G Street, S.E. on at least three occasions. Two confiscations involved searches of the house (November 30, 1995 and December 16, 1996) and one occurred immediately after a drug transaction (October 5, 1996).

On December 19, 1996, a grand jury for the United States District Court for the Dis-

trict of Columbia handed down a seventeen-count indictment charging Charles, Eugene, James, and Love Wade, Leon Creek, Floyd Davis, Rodney Banks, Wesley Baker and Raymond Parks with narcotic conspiracy, selling, possession and related offenses. Of particular note in regard to the question before this court, all the Wades were charged with maintaining a crack house in violation of 21 U.S.C. § 856(a)(2), and keeping a disorderly house in violation of D.C.Code § 22–2722. The initial indictment also included a criminal forfeiture allegation filed under 21 U.S.C. § 853, and a parallel civil action seeking to forfeit the property pursuant to 21 U.S.C. § 881(a)(7), *United States of America v. Property Identified as 647 G Street, S.E.,* 97–CV–0193 (RCL), with the latter dismissed by the government on October 7, 1997.

On May 28, 1997, defendants Eugene T. Wade and Charles E. Wade entered Rule 11(e)(1)(C) pleas to three counts in a joint superseding information filed against them, admitting to: (1) conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 18 U.S.C. § 371; (2) unlawful distribution of cocaine base, in violation of D.C.Code § 33–541; and, (3) keeping a disorderly house and aiding and abetting, in violation of D.C.Code §§ 22–2722 and 22–105. On September 25, 1997, this court sentenced Eugene and Charles Wade, and, because the agreed-upon plea included the offense of keeping a disorderly house, an Order of Abatement was issued. *See* D.C.Code § 22–2717 (requiring the entry of an order of abatement if the existence of a nuisance is established); *see also Raleigh v. United States,* 351 A.2d 510 (D.C.App.1976) (same). This order directed the United States Marshal for the District of Columbia to:

1. cause the effectual closing of the building at 647 G Street, S.E., against its use for any purpose, and so keeping it closed for a period of 1 year, unless sooner released by further order of the Court; and,

2. remove from the building all fixtures, furniture or movable property, to include any narcotic or other contraband,

and drug paraphernalia, as that term is defined in D.C.Code § 33–601(3), as plainly are used in conducting the nuisance of unlawfully selling crack cocaine base, as follows:

a. all such fixtures, furniture, or movable property used in conducting the nuisance, other than contraband, if any, shall be sold in the manner provided for the sale of chattels under execution;

b. except that, residents of 647 G Street, S.E., shall be first allowed to take from the premises all personal items and innocent property in the nature of personalty, that are not contraband or paraphernalia, and that are not plainly held for use in conducting the nuisance of unlawfully selling crack cocaine base;

3. give public notice that any person who shall break and enter or use 647 G Street. S.E., shall be punished for contempt of court, by fine of not less than $200 nor more than $1000, by imprisonment not less than three nor more than six months, or by both.

Almost immediately after its entry, a number of motions were submitted to this court challenging the Order of Abatement. These included:

(a) An Application to Vacate Order of Abatement and for Emergency Stay, filed by Shelton, Angel, Jean and Dorothy Wade and Sheila Gant ("third-party interveners"), none of whom were at any time defendants in the criminal case, but either reside at 647 G Street, S.E. and/or assert an ownership interest in the subject property;

(b) Two largely identical Motions to Vacate Order of Abatement and for Emergency Stay, one by defendant James Wade, who at the time of filing the motion was charged with keeping a disorderly house but was awaiting trial[1], and one by defendant Charles Wade who entered a plea of guilty to the disorderly house charge;

---

1. On December 5, 1997 James Wade entered a plea of guilty to a charge of attempted possession

of a controlled substance, cannabis/marijuana, in violation of D.C.Code §§ 33–541(d) & 33–549.

(c) A Motion to Reconsider Order of Abatement by Charles Wade.

Defendants and third-party interveners offer a wide array of challenges to this court's Order of Abatement. First, they argue that this court is without subject matter jurisdiction over the abatement of nuisances. Second, they claim that D.C.Code § 22–2717 provides for the mandatory issuance of an abatement order only when the property at issue is used for the purpose of lewdness, assignation or prostitution as set forth in D.C.Code § 22–2713. Because the charged offenses in this case are exclusively drug related, they contend that the disorderly house abatement scheme is inapplicable. Third, defendants and third-party interveners allege that with all of the defendants in this matter either sentenced, awaiting trial or no longer at or near 647 G Street, S.E., the alleged nuisance has already been effectively "abated," obviating the need for this court to proceed with a formal abatement order. Fourth, they claim that the non-defendant owners of the property—Dorothy, Shelton, Angel, and Jean Wade and Sheila Gant—were without guilty knowledge that any drug trafficking activity was taking place on the premises. Therefore, the Order of Abatement should not have been issued because the government did not prove that each of them knew or should have known of the illegal use. Finally, they make a series of claims that the Order of Abatement and D.C.Code § 22–2717 are unconstitutionally vague, overbroad and deprive the owners of their property without due process of law. Each of these challenges will be considered in turn.

## II. STANDING OF THE THIRD-PARTY INTERVENERS

■ Before addressing the substantive challenges to the Order of Abatement, this court must first consider the government's challenge to James, Shelton, Jean, Angel, and Dorothy Wade's and Sheila Gant's standing to challenge the Order. This court granted the non-parties' unopposed Application by Non-party for Leave to File Motions without at that time reviewing the question of their legal standing, in large part because of the novelty of the issues presented here, and in the interests of fairness.

■ James Wade was a party-defendant initially charged with the offense of keeping a disorderly house, but that charge was dismissed on December 5, 1997, meaning that has no D.C.Code § 22–2722 conviction from which to appeal. His standing to contest the order of abatement is now therefore predicated on the same grounds as the third-party interveners. The other four Wades and Sheila Gant were never indicted in this case and are not "parties" to the criminal matter in any traditional sense. It is a general rule that non-parties lack standing in a criminal case and may not appeal a criminal sentence awarded another. Nonetheless, based upon the written motions, affidavits and arguments of the parties, controlling law, and equitable considerations of justice and fairness, the court finds that the Application by Non party for Leave to File was properly granted, and that James Wade and the third-party interveners have standing to come before this court and contest the Order of Abatement.

■ James Wade and the third-party interveners claim that they have a legally cognizable ownership interest in 647 G Street, S.E., and, as such, have standing to oppose the abatement order. This court agrees with the proposition that an owner of the subject real property, even if not a defendant in the underlying criminal case, does have the ability to contest an abatement order entered pursuant to D.C.Code § 22–2722. *See Thomas Circle Limited Partnership v. United States,* 372 A.2d 555, 555–56 (D.C.1977) (permitting the owners of a building subject to an abatement order who were not parties in the criminal proceedings to move the trial court to set aside the order). The ability of third parties to intervene and assert their interest in the federal criminal forfeiture scheme is also instructive on this issue. *See* 21 U.S.C. § 853(n) (permitting non-defendant third parties to petition for a hearing to adjudicate the validity of an alleged interest in the property). While the disorderly house abatement scheme is distinguishable from the federal forfeiture procedure in many critical respects, the former should not be a

means by which innocent owners are deprived of their right to assert an interest in their property.

The government's argument against granting standing to James Wade and the third-party interveners does not so much take issue with the proposition that an owner of real property should have standing to contest an abatement order as it does with Shelton, Jean, James, and Angel Wade's and Sheila Gant's claim as owners of 647 G Street, S.E., as joint tenants. The government contends that Rosie B. Wade, the last titled owner of the property, died intestate. Under District of Columbia intestacy laws all property of a decedent passes directly to the personal representative, who thereafter holds legal title for administration and distribution of the estate. *See* D.C.Code § 20–105; *Richardson v. Green*, 528 A.2d 429, 432–37 (D.C.1987) (concluding that the plain language of section 20–105 indicates that any action respecting a decedent's property requires the appointment of a personal representative and that non-judicial dispositions of property are abolished in the District of Columbia). Absent some proof of legal ownership of 647 G Street, S.E. by the lineal descendants, the government contends that they cannot contest the abatement order.

While unable to demonstrate *legal* ownership of the subject property, the non-party applicants have demonstrated to this court's satisfaction that they have an *equitable* interest. District of Columbia property records demonstrate that title to 647 G Street, S.E. was transferred to Rosie B. Wade and Shelton Wade (Sr.), taking as tenants by the entirety, on October 12, 1948. *See* Certified Copy of Deed to 647 G Street, S.E. An affidavit of Shelton Wade states that Rosie B. Wade died intestate on September 5, 1994, leaving five issue—himself, Sheila Gant, Angel Wade, Jean Wade and James Wade. *See also* Certificate of Death of Rosie B. Wade (noting the date of death). Based on the foregoing, the five issue have at least an equitable or inchoate interest in the subject property as heirs at law.

As persons who have adequately demonstrated their equitable or inchoate interest in the property subject to abatement, this court

holds that they have standing to contest the court's September 25 Order. This conclusion is supported by this circuit's consideration of a similar question in the civil forfeiture arena. "It seems to us that it would just as much offend notions of due process for the government to scoop up property in which a third party has certain kinds of equitable interests as it would for the government to take property in which a third party has a 'legal' interest." *United States v. BCCI Holdings*, 46 F.3d 1185, 1190 (D.C.Cir.1995) (rejecting the notion that Congress intended to draw the distinction between legal and technically equitable claims in forfeiture challenges). *See also United States v. Lavin*, 942 F.2d 177, 185 n. 10 (3d Cir.1991). In a the disorderly house abatement scheme, where the effect of executing an order of abatement would be to displace people from their residence for a period of time, the conditioning of standing on the "ancient, but largely ignored" difference between legal and equitable interests in real property would violate contemporary notions of due process and fundamental fairness. *See BCCI Holdings*, 46 F.3d at 1190. These concerns are especially acute on these facts presented in this case, where a peculiarity in this jurisdiction's laws of intestate succession creates the legal fiction that only an as-yet unnamed personal representative has standing to challenge the Order of Abatement (other than the sentenced defendants). This court holds that as persons with a demonstrated equitable interest in 647 G Street S.E., the five children of Rosie B. Wade are properly before the court and have standing to contest the Order of Abatement.

■ As for Dorothy Wade, this court finds that she has also standing in light of the fact that: 1) she is the spouse of James Wade, a lineal descendant of Rosie B. Wade; 2) she presently resides at 647 G Street, S.E. and did reside there throughout the relevant time period; 3) she has a demonstrable degree of control over the property, as it is she who "has diligently paid the property taxes for 647 G Street, S.E. for the last twenty or so years." Application to Vacate Order at 8. This combination of factors is sufficient for this court to find that the interests of fair-

ness and justice would not be met if she could not participate in this proceeding.

### III. CHALLENGES TO THE SEPTEMBER 25, 1997 ORDER OF ABATEMENT

A.  Subject Matter Jurisdiction

■ In challenging this court's ability to issue the Order of Abatement, defendants [2] claim that this court lacks subject matter jurisdiction over the abatement of nuisances, first by claiming that this is an action involving real property and therefore must remain under the exclusive jurisdiction of the District of Columbia Superior Court pursuant to D.C.Code § 11–921. Defendants also contest this court's power to enter the Order of Abatement because it requires that a "local tax" be assessed against a building deemed a nuisance or a disorderly house, which allegedly would contravene D.C Code § 11–921(a)(1). Finally, they claim that only the District of Columbia Superior Court has general jurisdiction over common-law claims for relief. *See King v. Kidd,* 640 A.2d 656 (D.C.App.1993). Because each of these challenges stems from the same misunderstanding of the manner by which this court obtains jurisdiction over this matter and the power to abate nuisances, all three will be considered together.

■ Section 11–502(3) of the D.C.Code ("Criminal Jurisdiction") vests in the United States District Court for the District of Columbia jurisdiction over "any offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal Offense." This provision was enacted in order to avoid the procedural difficulties inherent in trying a single defendant for related D.C.Code and federal offenses in two separate proceedings. *See United States v. Garnett,* 653 F.2d 558, 561 (D.C.Cir.1981). Provided that "an indictment properly joins federal and local offenses under Federal Rule of Criminal Procedure 8", a federal district court has jurisdiction over all counts. *See*

*U.S. v. Johnson,* 46 F.3d 1166, 1172 (D.C.Cir. 1995); *United States v. Kember,* 648 F.2d 1354, 1359 (D.C.Cir.1980).

Here, Charles and Eugene Wade were charged with keeping a disorderly house in violation of D.C.Code § 22–2720 and with at least one federal count—conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 371. Because the indictment against the two Wades was comprised of both federal and local offenses, this court properly has exercised subject matter jurisdiction over the D.C. disorderly house count under D.C.Code § 11–502(3). There was no need for the government to file the abatement action in Superior Court as defendants claim; to require it to do so would create the precise "procedural difficulties" that section 11–502(3) anticipated and *Garnett* discussed.

Defendants' reliance upon *Coll v. Coll,* 690 F.Supp. 1085 (D.D.C.1988) in support of the argument that this court cannot exercise jurisdiction over a property-related matter demonstrates their fundamental misunderstanding as to how federal courts in the District of Columbia exercise jurisdiction over *criminal* laws applicable exclusively to the District of Columbia. Defendants accurately note that *Coll* holds that "actions involving partition and other property-related matters are considered actions of a purely local nature and are to remain under the jurisdiction of the Superior Court of the District of Columbia." *Id.* at 1089. However, this language is inapposite for several reasons. First, the *Coll* court was addressing the domestic-relations exception to federal diversity jurisdiction in civil cases, and the intended reach of any one quotation taken from that opinion must be considered in that context. Second, *Coll* would only be illustrative if it was a pendent jurisdiction case, where jurisdiction was properly exercised over a federal claim and the court nonetheless declined to hear the local property claim, since the exercise of jurisdiction in this case is most analogous to the pendent situation. Finally, and most significantly, it is patently clear that *Coll* does

2.  Having determined that the third-party interveners and James Wade have standing to contest the Order of Abatement, all persons challenging

the Order will be generally referred to as "defendants" unless the differences in their interests are relevant to the issue under consideration.

not stand for the proposition that a federal court is without jurisdiction over "actions involving real property" under any circumstances; if that were case, it would also follow that this court could not entertain civil forfeiture actions under 21 U.S.C. § 881(a), or hear cases arising under the federal criminal forfeiture statute. *Coll* therefore does not support defendants' claim that a federal court is without power to enter an order of abatement.

As to defendants' citation to D.C.Code § 11–921(a)(3) (exclusive Superior Court jurisdiction over matters involving real property), § 11–922 (same, matters involving common law claims for relief), and § 11–921 (same, matters pending in the Tax Court) as provisions preventing this court from exercising subject matter jurisdiction, this court responds by noting that all of these provisions involve limits on the *civil jurisdiction* of the courts, and that the Order of Abatement is entered pursuant to the *criminal* sentences of Charles and Eugene Wade.

## B. IS 647 G STREET, S.E. A "DISORDERLY HOUSE"

■ Perhaps the most compelling attack upon this court's Order of Abatement is defendants' assertion that 647 G Street, S.E. is not a "disorderly house" as anticipated by D.C.Code § 22–2722, and therefore cannot be abated under § 22–2717. In some respects, however, it is the contention least susceptible to reconsideration, as the Order of Abatement was issued pursuant to Charles and Eugene Wade's *guilty pleas* to the charge of keeping a disorderly house. Prior to this court's acceptance a plea, a defendant is required to state on the record that the conduct to which he or she is pleading, did, in fact take place and that he or she is guilty of the charges to which he or she is pleading. Furthermore, in the instant case, neither Charles nor Eugene Wade may reasonably

claim that he was unaware of the consequences of pleading guilty to the disorderly house charge.[3] Consequently, any *factual* issues concerning whether 647 G Street, S.E. is a disorderly house and public nuisance subject to an Order of Abatement are not in dispute; the government has already proven those matters beyond a reasonable doubt. However, in light of the novelty of this application of the disorderly house statute, this court will nonetheless address some of the factual questions raised by defendants in addition to the legal questions in offering its reasons as to why this 1914 Kenyon Act, 38 Stat. 280 ch. 16 §§ 1–9, codified at D.C.Code § 22–2713 *et seq.* may be applied to the drug trafficking activity at 647 G Street, S.E.

### 1. The Statutory and Legal Framework

D.C.Code § 22–2722, Keeping Bawdy or Disorderly Houses, states:

Whoever is convicted of keeping a bawdy or disorderly house in the District shall be fined not more than $1,000 or imprisoned not more than 180 days, or both.

D.C.Code § 22–2717, order of Abatement, states:

If the existence of the nuisance be established in an action as provided in §§ 22–2713 to 22–2720, or in a criminal proceeding, an order of abatement shall be entered as a part of the judgment in the case which order shall direct the removal from the building or place of all fixtures, furniture, musical instruments, or movable property used in conducting the nuisance, and shall direct the sale thereof in the manner provided for the sale of chattels under execution, and the effectual closing of the building or place against its use for any purpose, and so keeping it closed for a period of one year, unless sooner released.

Finally, in *Raleigh v. United States*, 351 A.2d 510, 514 (D.C.1976), the D.C. Court of Appeals concluded that, "when a defendant

---

3. At the September 25, 1997 sentencing, Eugene Wade engaged in a thirty minute diatribe about the consequences that the Order of Abatement would have on his family. This court specifically asked Mr. Wade if he had changed his mind about the plea and preferred to proceed to trial, at which point he clearly stated that he did not wish to "take my cop back." *See Transcript of*

*Sentencing,* September 25, 1997, at 44–46. Charles Wade's sentencing followed Eugene Wade's, and he also expressed concern as to where his mother, father and sister would relocate, demonstrating his awareness of the consequences of going forward with his guilty plea on the disorderly house count. *Id.* at 63.

has been found guilty of maintaining a bawdy or disorderly house in violation of section 22–2722, the house in question must be deemed to be a nuisance per se which the trial court is *compelled* to abate." (emphasis added).

2. Under the Common Law, a Disorderly House Was Not Limited Exclusively to Bawdy Houses

Central to this court's characterization that section 22–2722 of the D.C.Code may properly be applied to 647 G Street, S.E. is that the text of the provision mentions *both* bawdy houses *and* disorderly houses. While the definition of a disorderly house includes bawdy houses, bawdy houses are not the exclusive variety of disorderly houses.

The common-law definition of a public nuisance and "disorderly house" in the District of Columbia finds its origin in the early nineteenth century. A disorderly house included a number of different types of establishments, including bawdy houses, gambling houses and unlicensed taverns, with the common theme being that the premises were used to commit illegal acts and either disturbed the public peace or corrupted the morals of the community. *See* 24 Am.Jur.2d *Disorderly Houses* § 1 (1983). In *United States v. Bede,* 24 F.Cas. 1063, 1063 (C.C.D.C.1837) (No. 14,558), the court found an establishment to be a disorderly house when patrons were permitted to enter drunk, drank there, left drunk, and then proceeded to go "skylarking" which is "feeling strong and going through streets knocking down a sign post or a man when in their way." The opinion of the court also noted that the disturbance of the peace of society by violence as a factor determinative of what constituted a disorderly house. *Id.*

In *United States v. Benner,* 24 F.Cas. 1089 (C.C.D.C.1837) (No. 14,569) the court concluded that an indictment for keeping a disorderly house was supported where defendant kept an unlawful, disorderly and ill-governed house as a common tippling house, and openly served spiritous liquors. *See also United States v. Elder,* 25 F.Cas. 996 (C.C.D.C.1835) (No. 15,039) (rowdy public drinking house where great noises were made at night, which attracted disorderly persons, and which contained a public nine-pin alley deemed a disorderly house). These early cases all demonstrate that the term disorderly house was not limited in its scope only to brothels and houses of prostitution.

Also central to the court's determination that 647 G Street, S.E. can be found as a matter of law to be a disorderly house under § 22–2722 is the existence of District of Columbia precedent for the abatement of residential properties. In *Payne v. United States,* 171 A.2d 509 (D.C.App.1961), a woman was convicted of maintaining a disorderly house for receiving stolen property, i.e. meat shoplifted from a grocery, at her home on at least three occasions. This court agrees with defendants' concern that *Payne* theoretically extends the reach of the disorderly house nuisance scheme too far as it arguably permits abatement whenever a crime has *any* nexus with real property. Subsequent opinions by the D.C. Court of Appeals construing § 22–2722 recognize that *Payne* represents a departure. *See Harris v. United States,* 315 A.2d 569, 573 (D.C.1974) (discussed in more detail below). However, *Payne* is still good law supporting the proposition that a disorderly house prosecution is not limited to proprietors of businesses or commercial establishments. This court sees no reason to now place such a limitation on § 22–2722; a nuisance is a nuisance, and the offensive character of the public disturbance is not affected by the fact that persons may reside within the vexatious property.

3. The District of Columbia's Current Definition of a "Disorderly House" and Its Application to 647 G Street, S.E.

In *Harris v. United States,* 315 A.2d 569 (D.C.1974) the D.C. Court of Appeals, sitting *en banc,* was presented with the question as to what constitutes the crime of keeping a disorderly house under D.C.Code § 22–2722, and what the government is required to prove in prosecuting a case arising under the provision. The court looked to some of the above-cited common law cases in determining the conduct Congress was seeking to proscribe as the court stated, "[It]he common-law crime of keeping a disorderly house was the maintenance of premises upon which ac-

tivity occurred that either created a public disturbance or, although concealed from the public, constituted a nuisance per se such as a gambling house or bawdy house." *Id.* at 572. The court went on to hold: "We conclude that the government in a disorderly house prosecution must prove that the activities on the premises *either* disturb the public *or* constitute a nuisance per se." *Id.* (emphasis added).

■ Consequently, there are two means by which a court or other trier of fact may conclude that a disorderly house nuisance exists: first, if the property affirmatively disturbs the public and/or is openly vexatious; or, in the alternative, if the property is inherently considered to be a nuisance by the nature of the conduct transpiring therein, whether or not the property is affirmatively bothersome.

In the instant case, the government could arguably obtain a disorderly house conviction under either approach. However, this court will limit its consideration to the "disturb the public" prong, as the evidence before the court demonstrates that the activity at 647 G Street, S.E. has been so disruptive of the peace and quiet in the 600 block of G Street, S.E. that the property is properly held to be a disorderly house, and therefore an abatable nuisance under § 22–2717.[4] Whether a crack house is a nuisance per se, as that term is defined in this jurisdiction, is a matter that the court declines to address at this time.[5]

Over the course of their two-year investigation, Metropolitan Police undercover agents made ten purchases of crack cocaine in front of 647 G Street, S.E. from the various criminal defendants. Defendants use this fact as evidence that the nuisance was *de minimis,* claiming that "ten isolated narcotics transactions between October 6, 1994 and October 5, 1996 constitute the alleged nuisance." *See* Charles Wade's Motion to Vacate Order of Abatement at 5. In making this contention, defendants ostensibly allege that the drug sales *only* transpired in the presence of the police, or that this court is only entitled to look to those ten drug sales as the extent of the drug trafficking taking place outside 647 G Street, S.E. This court does not subscribe to the belief that a tree falling in the woods only makes a sound when there is someone there to hear it. Consequently, this court will presume that the police's ten documented drug buys are indicative of a far greater degree of drug trafficking at 647 G Street, S.E., and that the ten documented drug buys were not merely a product of fortuity.

In this case, the existence of an ongoing public disturbance has been established by persons other than the police officers investigating this matter. As discussed earlier, the Metropolitan Police Department received no fewer than 42 complaints about the drug trafficking activity between April 1995 and January 1997. Also, from the time this matter first came before this court, chambers has received and placed on the record a number of letters and petitions describing 647 G Street, S.E. as, *inter alia,* "a strong and irresistible magnet for disruptive, loud, menacing, intrusive, and threatening behavior." *See* Letter from Jim Simpson, Presi- '

---

**4.** The court's review of this evidence is dicta, because Charles and Eugene Wade pleaded guilty to the disorderly house charge. Factual issues, such as whether or not Charles or Eugene Wade "controlled" 647 G Street, S.E. (as that term is defined for disorderly house cases, *see Thomas v. United States,* 588 A.2d 272 (D.C. 1991)), or whether the drug trafficking created a public disturbance, has been proven beyond a reasonable doubt. Again, the court is only engaging in this analysis because of the novelty of the question presented.

**5.** Under *Harris,* a nuisance per se are "those kind of houses, such as gambling or bawdy houses, which are 'generally sought to be surrounded with an air of mystery and secrecy to keep knowledge of them from the general public' ....

The rationale for this common-law rule rested upon the potential in these houses for breach of the peace that is inherently present in numbers of persons frequenting such places for unlawful purposes." *Harris,* 315 A.2d at 571 (quoting *De Forest v. United States,* 11 App.D.C. 458, 463 (1897)). A reasonable argument could be made that a crack house fits under this definition; the inherent potential for breaches of the peace when a crack house is present is beyond question. However, this court does not at this time conclude that § 22–2722 is applicable whenever police seize a crack house, and therefore limits its reach to situations in which the government has proven that there exists an actual, demonstrative public disturbance.

dent Sousa Neighborhood Association to the Honorable Royce C. Lamberth (September 19, 1997). Furthermore, even affiants for the defendants have stated, "I have witnessed many hand-to-hand transactions of what I suspect to have been crack cocaine" and "The effect of the drug dealing was terrible; my wife and I stayed in the house and rarely ventured outside." Affidavit of Lesley J. Wheeler; Affidavit of Watson Stringfellow.

■ This court believes that the existence of "a complaining citizenry" is a crucial factor in determining whether a property constitutes an affirmative public disturbance such that the property may be held to be a disorderly house and abated. *See Raleigh*, 351 A.2d at 514 (noting that a house need not be proven "openly uproarious, offensive, or otherwise vexing to the community" to establish its status as a nuisance per se, thereby implying that those factors would be appropriate in making the public disturbance determination). In this instance, the voice of the complaining public rings strongly in the ears of the court.

Based upon all of the aforementioned evidence, this court concludes that the government has adequately demonstrated that the activity at 647 G Street, S.E. over the past three years constituted a pervasive, offensive and vexatious public disturbance such that the property is properly characterized as a disorderly house under the first prong of the *Harris* test. Therefore, under the present statutory scheme, this court's Order of Abatement was not only supportable, but required as a matter of law. *See Raleigh*, 351 A.2d at 510 (if the defendant is found guilty of maintaining a bawdy or disorderly house, the house has to be deemed a nuisance which the trial court is compelled to abate); D.C.Code § 22–2717 (If the existence of the nuisance be established . . . an order of abatement shall be issued).

4. Defendant's Claim that D.C.Code § 22–2717 Provides for Abatement Only of Buildings Used for the Purposes of Lewdness, Assignation or Prostitution.

■ Defendants argue that a court's ability to issue an order of abatement under D.C.Code § 22–2717 is limited to situations where the premises were occupied for purposes of lewdness, assignation or prostitution because § 22–2717 "cross-references § 22–2713." *See* Charles Wade's Motion to Reconsider Order of Abatement at 1–2. The difficulty with that assertion is that the cross-reference is slightly more extensive than defendant's excerpt. The phrase, quoted in full, reads "If the existence of a nuisance be established in an action as provided in sections 22–2713 to 22–2720, *or in a criminal proceeding*, an order of abatement shall be entered as part of the judgment in the case." (emphasis added) While it is true that a violation of section 22–2713 requires the issuance of an order of abatement, it equally indisputable that it is not the exclusive means by which such an order should issue. Were that the case, the phrase "or in a criminal proceeding" would be rendered as mere surplusage, a construction disfavored by the courts. *See, e.g., Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 117 S.Ct. 913, 917, 137 L.Ed.2d 93 (1997) ("legislative enactments should not be construed to render their provisions mere surplusage"). In this case, the United States Attorney for the District of Columbia proceeded against Charles and Eugene Wade for the criminal offense of keeping a bawdy or disorderly house. They both entered pleas of guilty, which means that the existence of the nuisance was determined "in a criminal proceeding." Under *Raleigh*, an order of abatement must therefore issue, because the finding of a disorderly house in a criminal proceeding demonstrates the existence of a nuisance that the court is compelled to abate. *See Raleigh*, 351 A.2d at 513.

In summary, section 22–2717 does not limit the abatement remedy exclusively to premises occupied for lewdness, assignation or prostitution as per section 22–2713 as alleged by defendants; it is appropriate for any disorderly house nuisance, provided that the existence of such nuisances are established in a criminal proceeding. As the existence of the nuisance in this matter was determined pursuant to Charles and Eugene Wade's guilty

pleas, the abatement order was properly issued under § 22–2717.

## C. The Nuisance Has Already "Abated"

■■■ Defendants contend that all of the individuals who constituted the alleged nuisance are either sentenced and incarcerated, will be sentenced shortly, or are otherwise no longer at or near 647 G Street, S.E. In light of this, combined with the fact that the government has alleged no acts of drug dealing since December 19, 1996, they claim that the nuisance is already abated, and therefore the only possible purpose for the Order is to punish the occupants and owners of the house, which would be improper. *See Thomas Circle Limited Partnership v. United States*, 372 A.2d 555, 557 (D.C.1977).

Defendant's contention that all the perpetrators of the nuisance are no longer at or near 647 G Street, S.E. ignores a critical fact: Love Wade and Raymond Parks remain at large. Until these two individuals are apprehended, any contention that the nuisance has abated is premature and will not be considered by this court.

This court does take notice of the affidavits of Watson Stringfellow and Lesley Wheeler, who both claim that they have not witnessed any drug activity or suspected drug transactions on G Street since December 1996. At the same time, it also recognizes a letter from the Sousa Neighborhood Association dated September 19, 1997 and filed with this court on September 25, 1997, which states "[t]he house at 647 G Street, SE, Washington has been and *continues to be* a strong and irresistible magnet for disruptive, loud, menacing, intrusive and threatening behavior on the part of visitors to this house." (emphasis added). At such time when the remaining two defendants are no longer at large, this court will entertain a motion for reconsideration of the Order of Abatement and will address whether an abatement order is proper as a matter of law when all perpetrators of the nuisance no longer have access to the property. Furthermore, at that time, the court may make a factual determination as to whether the nuisance has, in fact, abated. But this court cannot hold that the property in question no longer constitutes a disorderly house nuisance until all individuals that the grand jury has identified as creating the nuisance are brought before the court, and it can be conclusively determined that, in defendants' words "the individuals who . . . constituted the nuisance are no longer at or near 647 G Street, S.E."

## D. The Third Party Interveners Lack Constructive or Actual Knowledge of The Illegal Activities

The third-party interveners claim that the Order of Abatement should not have been issued in this case because they were without "guilty knowledge" of the illegal use of the property. In *Holmes v. United States*, 269 F. 489, 491 (App.D.C.1920), the D.C. Court of Appeals held that Congress could not have intended to subject citizens to an abatement order "unless he [the subject] possessed a guilty knowledge of the acts relied upon, or was fixed with presumptive knowledge because of the general reputation of the place." This "guilty knowledge" standard was later reformulated by the Court of Appeals, which held that to obtain a conviction for keeping a disorderly house, the government must prove that "the proprietor *knows* or *should know* of the acts and does nothing to prevent them." *Harris*, 315 A.2d at 575. Subsequently, in *Thomas Circle* the court allowed proof of actual or constructive knowledge through inferential reasoning. "It can be *inferred* that appellant should have known early in the lease's term that their property was being used for illegal purposes." *Thomas Circle*, 372 A.2d at 557; *see also Killeen v. United States*, 224 A.2d 302, 304 (D.C.1966) ("In addition, the requisite knowledge could have been proved inferentially since a proprietor is presumed to have knowledge of that which goes on in his premises.")

Unaddressed in any of these cases is the instant situation, where there are multiple owners who may vary as to their degree of "guilty knowledge."

As to the three non-resident lineal descendants of Rosie B. Wade, their Application to Vacate states that Shelton Wade resided in Prince George's County, Maryland, Angel Wade lived in Florida and Sheila Gant was a resident of northwest Washington, D.C.

throughout the relevant period. Consequently, they allege that they neither knew nor should have known that any illegal activity was being conducted at 647 G Street, S.E.

In regard to the resident lineal descendants, the Application to Vacate states that Jean Wade is mentally retarded, possessing the communication skills of a three-year old and the social domain of a six-year old. The interveners have provided this court with credible evidence of her condition. *See* Government of the District of Columbia Department of Human Services Individual Habilitation Plan of Jean Esther Wade (August 19, 1992). Given her cognitive capacities, defendants argue that she is incapable of having guilty knowledge of the activities transpiring at 647 G Street, S.E. As to Dorothy Wade, the wife of James Wade, she asserts that while she was aware that her son Charles Wade had a drug problem, she did not know, or have reason to know, that her home was involved in illegal drug activity. Defendants do not address whether James Wade, who was indicted in this matter, entered a plea of guilty to a marijuana charge, and is an equitable co-owner, did or did not have guilty knowledge.

It is uncontested that James and Dorothy Wade were, at all relevant times, residents of 647 G Street, S.E. It is also uncontested that:

1. On April 21, 1994, police served a narcotic search warrant at the address, and recovered illegal ammunition.

2. On October 6, 1994, the police arrested Leon Creek with drugs in front of the house.

3. On September 30, 1995, police arrested Eugene Wade, the son of Dorothy and James Wade, in front of the house and seized drugs from his nearly stash.

4. On November 30, 1995, police served a narcotic search warrant at the address and seized more than 60 ziplocks of crack cocaine base from inside the house. James Wade was home at the time.

5. On October 5, 1996, police arrested Whitney James Little after he sold drugs in front of the house they seized more drugs and his car parked across the street.

6. On December 19, 1996, police served a narcotic search warrant at the address and seized at least another 35 ziplocks of crack cocaine from inside the house.

■ Based solely upon the above—which fails to take into consideration the public meetings about the activity at the house—this court finds incredulous any claim that James and Dorothy Wade are without guilty knowledge of the drug trafficking activity transpiring at 647 G Street, S.E. and/or that they should not have "in reason" known what was happening. Without quoting all of the dramatic language from the Government's Consolidated Opposition, it is true that "no one would mistake the execution of a search warrant for a visit to sell tickets at the policeman's ball." It is an event that would put a resident on clear notice that something was amiss. The execution of multiple warrants should have driven the point home. Furthermore, the arrest of one's son in front of one's home should put the parents on "constructive," if not actual, notice that further inquiries were warranted. However, this court does not have to divine whether Dorothy and James Wade nonetheless were without actual guilty knowledge through a magnificent feat of willful blindness, as the *Thomas Circle* standard is "known or should have known." *See also Killeen*, 224 A.2d at 304 (holding that it is not necessary to prove actual knowledge if "appellants should have in reason known what was happening"). This court does not need a trial to determine whether James and Dorothy Wade should have known about the alleged activity. As the court noted in *Thomas Circle*, "Ownership carries its duties as well as its benefits. One of them is to keep property from a use which is unlawful. It is imposed upon the owner because that is where it ought to rest." 315 A.2d at 575. For a *resident* owner, this statement is even more poignant.

■ The government, having met its burden of proof as to the guilty knowledge of at least one owner [6], has satisfied the guilty

---

6. This court expresses no opinion as to whether

the other four equitable owners possessed the

knowledge element of the disorderly house scheme. This court disagrees with the third part-interveners' contention that a lack of guilty knowledge must be proved as to each of the five owners of the house. While it might work an injustice to abate a property in a case where *no* owner of the premises has guilty knowledge, the same injustice is not present simply because not *all* have guilty knowledge. *Holmes*, the case in which the guilty knowledge requirement was first articulated, strongly suggests this conclusion. The court stated that "if the act in question [the Kenyon Act] is susceptible of such a· construction [guilt without knowledge], then every hotel and apartment house in Washington is liable to be closed for a year, if it is made to appear that sporadic acts of lewdness and prostitution occurred therein, although without the knowledge *of either the owner or lessee."* The court's use of the "either, or" construction indicates that the knowledge of any one person in a position to control, end, or otherwise affect the improper activity is enough to satisfy this requirement.

This court's conclusion that the guilty knowledge of any one owner of a property in the multiple-owner situation is sufficient to satisfy the *Holmes/Thomas Circle* requirement is especially supportable on the facts of this case, in that it is not just "any" owner who has been held to have had the requisite knowledge. Even though there are five presumptive owners of the home, Dorothy and James Wade are indisputably *primus inter pares* as among the five. They are the resident owners and therefore are the ones who would have been most able to stop the nuisance. Furthermore, it is Dorothy Wade who "has diligently paid the property taxes for 647 G Street, S.E. for the last twenty or so years," Application to Vacate Order of Abatement at 8, which is arguably an indication that as far as decisions concerning the house went, Dorothy and James had a greater say than the nonresident owners. When the person(s) most in control is the same individual found to have the guilty knowledge, it does not violate norms of justice to order an abatement of the nuisance.

As to the claim that Shelton Wade, Sheila Gant and Angel Wade's lack of guilty knowledge should compel vacating the order of abatement, this court notes that among the reasons that guilty knowledge of the owners is required is because "Congress [did not intend] to subject a citizen to the provisions of the act, unless he possesses a guilty knowledge of the acts · relied upon ..." *Holmes*, 269 F. at 491. These three owners, however, are not in any sense being. "subject to the provisions" of the disorderly house statute. They are non-residents, so they will not be displaced. There is no indication that they derive any income from. the property. And, as this is an abatement and not a forfeiture, they will regain their full economic interest in the property at such·time as the one-year period of abatement has elapsed.

■ As to Jean Wade, it is indisputable that she will be "subjected to the provisions of the act" to some degree, as she will be displaced from her current residence· during the period of the abatement. However, her lack of guilty knowledge, if established, cannot be the basis upon which the Order of Abatement is ·vacated. Inherent in the concept that an owner's guilty knowledge is required for a court to abate a nuisance is that the person was both aware of the nuisance and nonetheless did nothing to prevent its continuation. Not insignificantly, the required mental state is "guilty" knowledge, as opposed to just knowledge. It is awareness coupled with inaction that renders an owner sufficiently culpable such that entering an order of abatement against that owner is not unjust. A person who is without any power to stop or otherwise prevent a nuisance because of infancy, incompetence or·other mental deficiency cannot be the basis upon which a court is proscribed from entering an order of abatement. The guilty knowledge requirement is not intended to be a means whereby culpable owners or operators of a property do a searching inquiry for some individual with an ownership interest upon which they can hang their claim of lack of

requisite guilty knowledge of the drug trafficking at 647 G Street, S.E., other than to note that the burden of proof initially rests with the govern-

ment, *see Harris*, 315 A.2d at 575, and that it has come forward with no evidence of guilty knowledge.

guilty knowledge. Rather, it is intended to address the situation the court faced in *Holmes:* that innocent proprietors and owners should not be subject to an order of abatement whenever an isolated act constituting a nuisance occurs on their property. Consequently, while Jean Wade's presence in the house may influence the emotions, it does not influence the law.

In summary, this court concludes that James and Dorothy Wade either did have actual guilty knowledge of the activity transpiring at 647 G Street, S.E., or should have had such knowledge through the exercise of due diligence. Therefore, the Order of Abatement was properly issued. As this court does not need to inquire into the mental state of the other four owners of the property, a trial as to their guilty knowledge is not necessary.

### E. The Order of Abatement Is Not Unconstitutionally Vague

Finally, defendants contend that the Order of Abatement is unconstitutionally vague and overbroad.

#### 1. The order of Abatement Deprives Defendants of Property Without Notice or the Opportunity to be Heard

■ First, defendants allege that the September 25 Order of Abatement deprives them of their property without "due process of law and opportunity to be heard." In addressing this claim, this court notes that the degree of procedural due process to be accorded prior to seizures in the civil forfeiture area has recently addressed by the Supreme Court. In *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53–59, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) the Court applied the three-part inquiry from *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) in determining that the government was required to provide both notice and an adversarial hearing before seizing real property subject to civil forfeiture.

This court concludes that the *Mathews v. Eldridge* balancing test compels a different result when applied to an abatement executed under the District of Columbia's disorderly house scheme, and a *Good* hearing is not required. Unlike the seizures at issue in *Good,* which can be executed on the probable cause determination of a magistrate, an order of abatement may only be issued if the government is able to prove its criminal case beyond a reasonable doubt. Therefore, the possibility of an erroneous deprivation is substantially lessened. Additionally, there is no danger of any permanent deprivation of a property interest, as the order of abatement expires after a period of one year, and defendants at all times will retain their equitable interest in the property.

However, because the right to maintain control over one's home is "a private interest of historic and continuing importance," *Good,* 510 U.S. at 53, this court was mindful of the necessity of providing a substantial degree of pre-deprivation due process. The September 25, 1997 Order of Abatement specifically stated that "*notice of the date of the closing of 647 G Street, S.E., pursuant to this Order, shall be given to the residents of 647 G Street. S.E.,* not fewer than fourteen calendar days in advance of the closing." (emphasis added). As the third party interveners' motion was filed within the fourteen day period (October 8, 1997), this court does not understand their claim that they were without notice. This court permitted the third-party interveners to file motions *prior* to any formal determination as to whether they in fact had adequate legal standing to appeal the Order. Defendants and the third-party interveners were presented with the opportunity to supply this court with documentary evidence and affidavits. Finally, on October 30, 1997, this court held a non-evidentiary adversarial hearing, permitting both named defendants' counsel and counsel for the third-party interveners to make arguments; again, this was conducted prior to any determination as to whether the latter had standing to appear before the court. All of the aforementioned due process was provided *prior* to the deprivation of any property interest, as the Order of Abatement has been stayed pending this court's ruling on the motions.

Based on the substantial degree of due process provided in this case, this court finds defendants' argument that the Order of Abatement "deprives the owners and resi-

dents of 647 G Street, S.E. of property without due process of law or even opportunity to be heard" to be without merit.

### 2. The Language of the Order of Abatement is not Vague

█ Second, defendants argue that the language of the abatement order is vague and overbroad because it directs the United States Marshals to remove all fixtures and furniture that "are used in conducting the nuisance of unlawfully selling crack cocaine base." They contend that this instruction gives the U.S. Marshals "the judicial power to determine what fixtures and furniture are used to sell crack cocaine base." However, that claim fails to take into account this court's explicit direction that "residents of 647 G Street, S.E., shall *first* be allowed to take from the premises all personal items and innocent property in the nature of personalty." (emphasis added). In light of the fact the residents are being offered the opportunity to remove their personal items *before* the Order of Abatement is executed, this court fails to see how the order "basically gives the U.S. Marshal the discretion to remove everything from the house," or how the order effectively deprives the residents of their property without due process of law.

### 3. Defendants Have Not Met Their Burden in Proving That the Statute Is Vague, Overbroad or Violative of Due Process.

Finally, defendants, in a one sentence assertion, state that D.C.Code § 22–2717 is vague, overbroad and deprives the owners of their property without due process of law. Defendants' briefing of this challenge offers absolutely no legal, factual, or rhetorical support and the court therefore declines to address it.

## IV. A STAY IS NOT WARRANTED IN THIS MATTER

█ Rule 38(e) (Stay of Execution, Criminal Forfeiture) of the Federal Rules of Criminal Procedure authorizes either the dis-

trict court or the court of appeals to order a stay if an appeal is taken, upon such terms as the court finds appropriate. While 38(e) governs forfeitures, and not abatement, it is the provision that most closely captures the issues presented here, and this court will operate under its standards.

This Order of Abatement was issued nearly three months ago because Charles and Eugene Wade pleaded guilty to keeping a disorderly house at 647 G Street, S.E. The government sought to prosecute these two defendants under this provision of the D.C.Code because the house has, for a period of nearly three years, been an open, obvious, notorious and vexatious public nuisance. In deciding whether to grant a stay, the court must consider not only its effect on the resident appellants,[7] but also upon those who make their home at the 600 block of G Street, S.E. Delaying the execution of the Order of Abatement leaves open the possibility that the nuisance will continue throughout the period of appeal, and with some of the alleged perpetrators of the nuisance still at large, particularly Love Wade, the daughter of James and Dorothy Wade, this court finds the fear of a continuing nuisance more than reasonable.

Defendants are correct when they assert that the purpose of an order of abatement is not to punish, but rather to rid the community of a nuisance. See Motion to Vacate Order of Abatement at 5; *Thomas Circle,* 372 A.2d at 557. The time to rid the 600 block of G Street of the nuisance located at 647 G Street, S.E. has now arrived. The request for the stay is therefore denied.

While this court concludes that a stay pending resolution of the appeal is not warranted, the U.S. Marshal will be directed to stay execution of the Order of Abatement for a period of five days following entry of the order accompanying this memorandum opinion. This should provide defendants with an adequate opportunity to seek a stay from the Court of Appeals.

A separate order shall issue this day.

---

**7.** Charles Wade filed a Notice of Appeal on October 1, 1997, and Eugene Wade filed on October 3, 1997.

*ORDER*

This matter comes before the court on the motions of defendants Charles and James Wade and third-party interveners Shelton Wade, Sheila Gant, Angel Wade, Jean Wade and Dorothy Wade to stay, vacate and reconsider this court's September 25, 1997 Order of Abatement for the property located at 647 G Street, S.E., Washington, D.C. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that the Motion to Vacate Order of Abatement of defendant James Wade is DENIED; and it is further

ORDERED that the Motion to Vacate Order of Abatement of defendant Charles Wade is DENIED; and it is further

ORDERED that the Motion to Reconsider Order of Abatement of defendant Charles Wade is DENIED; and it is further

ORDERED that the Application to Vacate Order of Abatement of third-party interveners Shelton Wade, Sheila Gant, Angel Wade, Jean Wade and Dorothy Wade is DENIED; and it is further

ORDERED that the request for a stay pending appeal pursuant to Fed.R.Crim.P. 38(e) is DENIED; and it is

ORDERED that this court's Order of Abatement of the disorderly house and public nuisance at 647 G Street, S.E., Washington D.C. shall not be executed by the United States Marshal for the District of Columbia before December 18, 1997 at 9:00 a.m., so that a stay may be sought from the Court of Appeals for the District of Columbia Circuit.

SO ORDERED.